## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## SHREVEPORT DIVISION

MARY LASHONDA WEBBER                    CIVIL ACTION NO. 10-1177

VERSUS                                  JUDGE S. MAURICE HICKS, JR.

CHRISTUS SCHUMPERT HEALTH               MAGISTRATE JUDGE HORNSBY
SYSTEM

### MEMORANDUM RULING

Before the Court is a Motion for Summary Judgment (Record Document 12) filed by

Defendant Christus Schumpert Heath System ("Schumpert").  Schumpert moves for

summary judgment on Plaintiff Mary LaShonda Webber's ("Webber") racial discrimination,

retaliation, and intentional infliction of emotional distress claims.  See id.  While Webber

concedes her racial discrimination claim based on failure to promote, she opposes the

Motion for Summary Judgment on all other grounds.  See Record Document 16.  For the

reasons which follow, the Motion for Summary Judgment is **GRANTED** and all of Webber's

claims against Schumpert are **DISMISSED**.

### BACKGROUND[1]

Webber, a black female, was hired by Schumpert in April 2008 as a Human

Resources ("HR") Business Partner.  She was hired by Nicole Williams ("Williams"),

Schumpert's former Director of HR.  Williams is also a black female.  Williams was

---

[1]Schumpert filed a Statement of Uncontested Facts.  See Record Document 12-1.
In response, Webber filed a Response to the Statement of Uncontested Facts, which
specifically stated whether Schumpert's statement of fact was "uncontested" or "contested."
See Record Document 16-2.
    Webber did not contest many of Schumpert's facts.  Therefore, the Court has simply
incorporated these undisputed facts.  The disputed facts are noted and specific citations
to the summary judgment record are provided for any such disputed facts.

Webber's direct supervisor during the majority of her employment.  During the majority of the time in question, Williams reported to Wendy White ("White"),  Schumpert's Regional Vice President of HR.[2]  Webber conceded that Williams was her direct supervisor; however, she maintains that White had ultimate supervisory authority over her.  See Record Document 16, White Deposition at 16-17, 20, 24.

Until the summer of 2009, Schumpert employed four employees in the HR Business Partner position.  Job duties between the employees were allocated by departments.  Each employee was assigned to a specific list of departments within Schumpert's organization. In the summer of 2009, Schumpert implemented a system-wide reduction in force.  As a result of the reduction, one of the individuals employed as an HR Business Partner was severed and one employee was moved out of the position.  Only Webber and one other employee, Beth Maddox ("Maddox"), remained in the position.  Maddox is a Caucasian female.

Following the reduction in force, Schumpert allocated job duties between the two remaining HR Business Partners by campus, rather than department.  Webber became primarily responsible for the St. Mary Campus and Maddox became primarily responsible for the Highland Campus and for Schumpert's outlying facilities.  Maddox was also responsible for maintaining Schumpert's written policies and served in an education role. See generally Record Document 12, White Deposition at 61-63.  Webber contends that Maddox did not have any additional responsibility after reduction in force and that she

---

[2]Schumpert stated that White is a Caucasian/Asian female.  See Record Document 12-1 at ¶ 4.  Webber disputes this fact, stating that she has no knowledge of White's national origin.  See Record Document 16-2 at ¶ 4.

actually had responsibilities relating to policy revisions taken away.  See Record Document 16, Williams Deposition at 118-119.

Schumpert contends that the decisions regarding the changes made to the HR Department, including which HR Business Partner was severed and the division of remaining job duties between Webber and Maddox, were made almost exclusively by Williams.  See Record Document 12, Williams Deposition at 55-56, 61, 63.  Webber contests this fact, in that she contends all decisions made by Williams were approved by and supervised by White.  See Record Document 16, White Deposition at 16-17, 20, 24.

Webber's job duties did not change as a result of the reorganization.  She was performing the same duties as before, just for an increased number of departments.  See Record Document 12, White Deposition at 65-66.  Webber does not contest that her job duties did not change; rather, she notes that there was a significant increase in administrative duties and her workload doubled.  See Record Document 16, Webber Deposition at 43, 79, 83-84; Williams Deposition at 113-115.  Neither Webber nor Maddox received any pay increase as a result of the reorganization.

Webber claims that she approached Williams in August of 2009 about a pay increase.  See Record Document 12, Webber Deposition at 66-68.  In her deposition, Webber testified that she did not raise any complaints about race discrimination or racial inequities at that time.  See id. at 67-68.  Rather, she just considered it a good opportunity to ask for a raise due to the fact that she had become responsible for an increased number of departments.  See id.  While Webber claims that she followed up with Williams in November of 2009 about a possible pay increase, she again testified in her deposition that she did not raise any concerns regarding race discrimination during that conversation.  See

id. at 68-69, 71-73.  Rather, she simply felt as though she deserved a raise because she "had taken on more responsibilities."  Id. at 72.

On January 25, 2010, Williams emailed an "Interoffice Memorandum" to White entitled "Disparate Treatment."   Record Document 12, Webber Deposition at LW-6. Williams stated in the memo that she wanted "to increase [Webber's] salary by 10%."  Id. As justification for the request, Williams argued that the impact of the reorganization that occurred in the summer of 2009 was felt most by Webber.  She also argued that Webber was a more competent employee than Maddox.  Williams attached a spreadsheet to the memo that she claimed illustrated "the issue of fairness." Id.  Maddox, the only other HR Business Partner, was not included on the spreadsheet.  There is no dispute that Webber played no role in preparing the memo or the attached spreadsheet that was presented to White by Williams.  In fact, Webber did not see the memo until after she left Schumpert.

White and Williams discussed the memo on or around January 27, 2010.  See Record Document 12, White Deposition at 42.  Schumpert contends that Williams' primary concern at the time was not the possibility of race discrimination.  See id. at 42-43.  Rather, it was that Webber would leave Schumpert if she did not receive a pay increase.  See id. Conversely, Webber contends that the memo details race discrimination and White considered the memo to be a claim of race discrimination.  See id. at 37-38.

Schumpert contends that White explained to Williams that she did not feel that Webber was entitled to a pay increase because her job duties had not changed as a result of the reorganization.  See id. at 40-42.  White also explained that the employees listed by Williams in her spreadsheet were not comparable to Webber.  See id.  Webber alleges that White did not focus on job duties and conducted no investigation to determine if the

employees listed were true comparators.  See id. at 24, 45.

White did not want Webber to leave Schumpert.  She suggested that Webber be moved into a position that would prepare her to take over as Director of HR if and when Williams vacated the position.[3]  White proposed a plan to eliminate the HR Business Partner position and move Webber into a management position under the Director of HR with responsibility for both the St. Mary Campus and the Highland Campus.  Maddox, the other HR Business Partner, was to be moved into an organizational development role, focusing primarily on employee education.  Under the plan, Webber would receive a pay increase as she was to assume supervisor responsibilities.

Williams agreed with White's plan and began to work on job descriptions for the new positions.  On February 3, 2010, Williams emailed White a proposed job description for Maddox's new position, noting that she was still working on the one for Webber.  Webber was elated with White's proposal.  In response to White's proposal, Williams was excited for Webber and felt as though the proposal adequately addressed all the concerns raised in her January 25, 2010 memo.  She did not ask for any other action to be taken by White.

Williams was terminated by Schumpert on February 9, 2010.  Following Williams' termination, White asked Webber to assume the position of Interim Director of HR.  Webber accepted the position and received an immediate 10% pay increase.[4]  Webber served in this position for less than one month.  Schumpert contends that if she had not resigned,

---

[3]Williams was pursuing her Ph.D. at the time and her ultimate goal was to pursue a career as a corporate executive coach.

[4]Prior to her becoming Interim Director of HR, Webber's rate of pay was $29.36 per hour.  As Interim Director of Human Resources, Webber's rate of pay increased to $32.33 per hour.  At this same time, Maddox's rate of pay was $29.66 per hour.

Webber's interim position would have been made permanent.  See Record Document 12, White Affidavit at ¶ 9. Webber contends that she was not guaranteed the position.  See Record Document 16-2 at ¶ 25.  After Webber became the Interim Director of HR, the plan proposed by White in response to Williams' memo was placed on hold.   Following Webber's resignation, Schumpert decided not to move forward with, and never filled, the proposed position.

Webber was scheduled to take a vacation with Williams from February 25, 2010 until March 1, 2010.   Prior to their vacation, Webber began removing some personal effects from her office, leaving only the items that were provided by Schumpert.[5]  Webber was scheduled to return to work following her vacation with Williams on March 2, 2010.

At approximately 7:00 a.m. on the morning of March 2, 2010, Webber telephoned a co-worker, Kathy Paine ("Paine"), and stated that she would not be in to work that day. Webber also stated that she needed to pick up a chair, one of her remaining personal effects, from the office.  Following her telephone conversation with Paine, Webber also emailed White and informed her that she was unable to return to the office that day and that she would return to the office on March 3, 2010.  Webber offered no explanation for her absence.

At sometime between 8:00 a.m. and 10:00 a.m. on March 2, Maddox called White, who was driving from Alexandria, Louisiana to Schumpert's St. Mary Campus in

---

[5]While contested by Webber, Schumpert contends that Webber was actively seeking other jobs in January through March 2010.  See Record Document 12-1 at ¶ 32.  In fact, Schumpert contends that Webber was interviewing for other jobs when she missed work on March 2, 2010.  See id. at ¶¶ 36-37.

Shreveport.  Maddox put Paine on speaker phone and she relayed Webber's phone call about not reporting to work and her plans to pick up her chair from the office.  White then tried to contact Webber to discuss the situation.  White was unable to reach Webber and left a voicemail on her cell phone.  White also followed up her phone call with an email asking Webber to contact her on her cellphone.

White had previously received reports from other employees in the HR Department that Webber was removing personal items from her office.  This information, coupled with the information she received from Maddox and Paine, left White with significant doubt that Webber would return to work.  See Record Document 12, White Deposition at 88.  Webber argues there was no reason for doubt, as she always reaffirmed her intention of staying at Schumpert.  See Record Document 16-2 at ¶ 40.

Based on the aforementioned concerns and the fact that she had been unable to reach Webber, White asked Schumpert's Information Management Department to suspend Webber's access to the computer system.  See Record Document 12, White Deposition at 88.  Bruce Honea ("Honea"), a Regional Operations Manager in the  Information Management Department, processed the suspension request between 11:09 a.m. and 11:24 a.m. on March 2.  See id., Honea Affidavit at ¶ 3.

Webber emailed White at 2:06 p.m. on the afternoon of March 2.  She questioned why her computer access had been cancelled and whether she was still employed by Schumpert.  White responded to the email at 2:09 p.m., informing Webber that her access had not been terminated, only suspended.  White also informed Webber that she had not been terminated.  White asked if she could contact Webber to discuss the situation.

White did not hear from Webber until approximately 4:30 p.m. on the afternoon of

March 2, when Webber called White on her cell phone.  Webber secretly recorded this call. During the conversation, White informed Webber that she had not been terminated and asked her to return to work.  She also made it clear that she did not want Webber to leave Schumpert and informed Webber that she viewed her as a future member of leadership. White contends that Webber refused to state whether she planned to return to work.  See Record Document 12, White Deposition at 104-105.  Webber contends that she made it clear to White that she intended to return to work the next day.  See Record Document 16-2 at ¶ 47.  Webber drafted a letter of resignation, or what she refers to as a letter of constructive discharge, on the evening of March 2.

At 6:03 a.m. on March 3, 2010, Webber attempted to access her Schumpert computer account and discovered that her computer access was still suspended.  She then tendered her letter on March 3.  She attempted to deliver the letter to White at 8:45 a.m. White was not yet in the office, so Webber subsequently emailed her the letter later that day.  Webber made no other attempt to contact White to discuss her computer access or her employment status before resigning from Schumpert.

White took steps to reactivate Webber's computer access on the morning of March 3.  White asked Maddox to report to the St. Mary Campus on the morning of March 3 and to contact her if Webber returned to work so she could reactive her computer access. Maddox contacted White that morning and reported that Webber was returning to work. White then contacted the Information Management Department and requested that Webber's computer access be reactivated.  Honea confirmed White's request  via email at 8:37 a.m.  Webber's access was fully restored at 8:57 a.m.

Webber reported her resignation, or alleged constructive discharge, to Tina Davis,

another employee in the HR Department.  Upon learning of Webber's resignation, White again contacted the Information Management Department and requested, for the first time, that Webber's computer access be terminated, as compared to suspended.

On April 6, 2010, Webber filed a Charge of Discrimination with the EEOC, claiming that she was the victim of race discrimination and retaliation.  On May 3, 2010, the EEOC dismissed Webber's Charge and issued a Notice of Right to Sue.  Webber filed the instant lawsuit on July 21, 2010, alleging that she was discriminated against on the basis of race and was retaliated against for opposing racial discrimination.   She also claims that Schumpert engaged in actions that constituted intentional infliction of emotional distress.

## LAW AND ANALYSIS

### I.      Summary Judgment Standard.

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[6]  Quality Infusion Care, Inc. v. Health Care Serv. Corp., 628 F.3d 725, 728 (5th Cir. 2010).  "Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Patrick v. Ridge, 394 F.3d 311, 315 (5th Cir.2004).   If the movant demonstrates the absence of a genuine dispute of material fact, "the nonmovant must go beyond the pleadings and designate

---

[6]The Court notes that the newly amended Rule 56 requires that there be "no genuine *dispute* as to any material fact," but this change does not alter the Court's analysis. F.R.C.P. 56(a) and advisory committee's note (emphasis added).

specific facts showing that there is a genuine issue for trial."  Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir.2004).  Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted.  See Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir.2005).

## II.   Racial Discrimination Claim.[7]

Webber asserts a racial discrimination claim in the form of pay inequities.[8]  See Record Document 16-1 at 1.  In order to establish a *prima facie* case of discrimination on the basis of race, Webber must show she was: "(1) a member of a protected class; (2) qualified for the position held; (3) subject to an adverse employment action; and (4) treated differently from others similarly situated."  Abarca v. Metropolitan Transit Authority, 404 F.3d 938, 941 (5th Cir. 2005).  The Court will focus on prongs three and four of this test.

Adverse Employment Action

In early February 2010, Webber assumed the position of Interim Director of HR.  While Schumpert considered this a promotion, Webber considered it a demotion.  See Record Document 12-1 at ¶ 24; Record Document 16-2 at ¶ 24.  However, there is no dispute that Webber received an immediate 10% pay increase.  This was the same amount

---

[7]Webber has asserted a racial discrimination claim under Louisiana's Employment Discrimination statute, Louisiana Revised Statute 23:301, *et seq.*  See Record Document 1 at ¶ 12.  Such claim is analyzed under the same standards as Title VII.  See Nichols v. Lewis Grocer, 138 F.3d 563, 566-567 (5th Cir.1998).

[8]Webber previously alleged that she was denied the Employee Relations Specialist promotion  due to her race and that her alleged "promotion" to Interim Director of HR was, in fact, a demotion.  See Record Document 16-1 at 1 note 1.  However, Webber has now withdrawn any racial discrimination claim relating to failure to promote.  See id.

requested for Webber by Williams in the January 25, 2010 Memorandum.  See Record Document 12, Webber Deposition at LW-6.  Thus, because Webber received a 10% pay increase, she cannot establish that she was subjected to an adverse employment action. See McMillan v. Corridan, No. 97-3981, 1999 WL 729250, *6 (E.D.La. Sept. 15, 1999), citing  Douglas v. DynMcDermott Petroleum Operations, Inc., 144 F.3d 364, 373 n.11 (5th Cir.1997) (finding a "fully satisfactory" performance rating not an adverse employment action); Harrington v. Harris, 114 F.3d 359, 366 (5th Cir.1997) (holding that, where plaintiffs actually received pay increases, a mere dispute over the quantum of pay increases does not establish an adverse employment action under § 1983); Marino v. Louisiana State Univ. Bd. of Supervisors, No. 96-1689, 1998 WL 560290, at *8 (E.D.La. Aug. 27, 1998) (holding a pay raise lower than other faculty members not an adverse employment action); Mattern v. Eastman Kodak Co., 104 F.3d 702, 708 (5th Cir.1997) (holding a missed pay increase not an adverse employment action).   Summary judgment in favor of Schumpert is, therefore, granted on Webber's racial discrimination claim.

Similarly Situated

Summary judgment in favor of Schumpert is also appropriate on the ground that Webber has failed to establish that she was treated differently from other similarly situated. Webber argues that after Schumpert's reorganization in the summer of 2009, she was dissatisfied with her pay.  She contends that she "had taken on numerous additional duties that resulted in the doubling of her workload without additional compensation while other similarly situated white employees were paid more and had a reduction in workload or had received additional compensation for taking on new responsibilities."  Record Document 16-1 at 4.

Webber argues Maddox was a similarly situated white comparator whose workload went down after the reorganization, but yet she was still paid more than Webber.  See id. at 6-7.  Additionally, Webber contends that Williams' January 25, 2010 Memorandum "shows that white comparators listed . . . therein are 'similarly situated,' as each person listed on the chart was a person who had taken on additional responsibilities as a result of [Schumpert's] reorganization and each person was a person for whom additional compensation had been granted as a result thereof."  Id. at 5.  In support of her argument that the memo identifies comparators, Webber focuses on "change of status."  Id. at 6.  According to Williams, who prepared the memo, she reviewed all of Schumpert's employees and "focused on employees who had a change of status due to receiving additional compensation as a result of taking on additional responsibilities in the year 2009."  Id.  In her opinion, and as evidenced by the memo, this review "established that out of the nine employees who fell in this 'change of status' category, all eight white employees had received a pay increase, and that the only employee throughout the entire system . . . who had assumed additional responsibilities without an accompanying increase in compensation was [Webber,] who was black."  Id.

In Lee v. Kansas City Southern Ry. Co., 574 F.3d 253 (5th Cir. 2009), the Fifth Circuit discussed the general parameters of the similarly situated standard.  The Lee court explained that "nearly identical" is not synonymous with "identical."  Id. at 260.  However, the Fifth Circuit reasoned:

> Employees with different supervisors, who work for different divisions of a company or who were the subject of adverse employment actions too remote in time from that taken against the plaintiff generally will not be deemed similarly situated.  Likewise, employees who have different work responsibilities . . . are not similarly situated.  This is because we require that

an employee who proffers a fellow employee as a comparator demonstrate that the employment actions at issue were taken "under nearly identical circumstances."  The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories.

Id. at 259-260.

Here, Webber admitted in her deposition that neither she nor Maddox, the only two remaining HR business partners, received a pay increase as a result of the reorganization. See Record Document 12, Webber Deposition at 65.  There is also no dispute that Maddox had more seniority than Webber.  See id., White Deposition at 45;[9] see also Atterberry v. City of Laurel, No. 09-00172, 2010 WL 2545412, *4 (S.D.Miss. June 18, 2010) ("Adams, as noted above, had more seniority.  Given these distinctions the two employees, although they both worked as field inspectors for the city and were both subject to be laid off, are not 'nearly identical' and therefore cannot be considered as similarly situated.").

Moreover, the employees listed in the memo and spreadsheet were not similarly situated to Webber.  Maddox, the most obvious comparator, was not included in the spreadsheet.  See Record Document 12, Webber Deposition at LW-6 and Williams Deposition at 118.  Williams also confirmed in her deposition that all of the employees included on the spreadsheet had different supervisors than Webber, all worked in different departments than Webber, and none of them performed the same job as Webber.  See id., Williams Deposition at 117-118.  The spreadsheet also shows that these employees

---

[9]In her deposition, White stated that any discrepancy between Webber and Maddox's salary "was not substantial and was related to [Maddox's] seniority."  Record Document 12, White Deposition at 45.

experienced the "change of status" at times ranging from March 2009 to December 2009, a period of approximately nine months.  See id., Webber Deposition at LW-6; see Lee, 574 F.3d at 259-260 ("Employees with different supervisors, who work for different divisions of a company or who were the subject of adverse employment actions too remote in time from that taken against the plaintiff generally will not be deemed similarly situated.  Likewise, employees who have different work responsibilities . . . are not similarly situated.").  The summary judgment record simply does not support a finding that the employees in the spreadsheet are appropriate comparators for purposes of Webber's racial discrimination claim relating to pay inequities.

## III.   Retaliation Claim.[10]

Webber asserts a retaliation claim that she alleges culminated in the termination, i.e., constructive discharge, of her employment.  See Record Document 16-1 at 1.  To establish a *prima facie* case of retaliation, Webber "must show that (1) she participated in a Title VII protected activity, (2) she suffered an adverse employment action by her employer, and (3) there is a causal connection between the protected activity and the adverse action."  Stewart v. Mississippi Transp. Commission, 586 F.3d 321, 331 (5th Cir. 2009).

Protected activity "is defined as opposition to any practice rendered unlawful by Title

---

[10]Webber also asserted a retaliation claim under the Louisiana Human Rights Act, more specifically Louisiana Revised Statute 51:2256.  See Record Document 1 at ¶ 4.  This claim fails as a matter of law, as liability under anti-retaliation provision of Louisiana's Human Rights Act is limited to retaliation against practices made unlawful under that Act, and does not extend to employment discrimination matters addressed by Louisiana Employment Discrimination Law.  See Smith v. Parish of Wash., 318 F.Supp.2d 366 (E.D.La. 2004); Lowry v. Dresser, Inc., 2004-1196 (La.App. 3 Cir. 2/2/05), 893 So.2d 966, 968-969.

VII, including making a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII." Ackel v. National Communications, Inc., 339 F.3d 376, 385 (5th Cir. 2003).  Yet, "[n]ot every complaint garners its author protection under Title VII." See Broderick v. Donaldson, 437 F.3d 1226, 1232 (D.C. Cir. 2006), citing Pope v. ESA Services, Inc., 406 F.3d 1001, 1010 (8th Cir.2005) (stating that commenting about absence of black employees, without alleging discrimination, was insufficient to qualify as protected activity).  "While no 'magic words' are required, the complaint must in some way allege unlawful discrimination, not just frustrated ambition." Broderick, 437 F.3d at 1232.

Here, Webber contends that she engaged in protected activity when she reported race discrimination relating to pay inequity.  See Record Document 16-1 at 8-10.  This claim relates to the January 25, 2010 Memorandum and spreadsheet.  Yet, the memo and spreadsheet cannot serve as the basis for Webber's retaliation claim, as it is undisputed that Webber played no role in preparing the memo or the spreadsheet.  In fact, Webber did not see the memo until after she left Schumpert.

Moreover, Webber admitted in her own deposition that she did not raise complaints regarding race discrimination when she asked Williams for a pay increase.  Specifically, in relation to her August 2009 conversation with Williams, Webber stated:

> Q.    Did you raise any complaints about race discrimination or racial inequities during that conversation?
>
> A.    No . . . .

Record Document 12, Webber Deposition at 67.  Likewise, in regards to her November 2009 follow up conversation with Williams, Webber stated:

> Q.    Okay.  In November of 2009 did you make any statements to [Williams] that you felt like you weren't being paid enough because of

your race?

A.      No, I didn't tell her that . . . .

Q.      Okay.  So you felt like you weren't being paid according to your responsibilities at that time.

A.      Yes.

Q.      And you –

A.      That's why I brought up the increase in salary since I had taken on more responsibilities.

Q.      Okay.  And you felt like that was because of your race or had race not come into it at that time?

A.      No, race didn't come into it until I realized everyone else was getting those. . . .

Q.      Okay.

. . .

Q.      Okay.  So in November of 2009 your request or your follow up with [Williams] regarding a salary increase, did that have anything to do with race or race discrimination or was that still your desire to receive an increase in salary because you had taken on more associates?

A.      At this particular time I was doing this based upon associates.

Q.      Okay.  So race or race discrimination –

A.      Had not come into play then.

. . .

Q.      Okay.  It's my appreciation that this is the memo [the January 25, 2010 Memorandum] that is referenced in your EEOC charge . . . .

A.      That is correct.

Id. at 71-74.  Webber also admitted that she never had any conversations with White about her desire to get more money or to receive a raise.  See id. at 71, 72.

Webber's deposition testimony clearly fails to support her allegation that she engaged in protected activity when she reported race discrimination relating to pay inequity. Her allegations are simply insufficient to create a genuine issue of material fact.  See Reynolds v. Barrett, 741 F.Supp.2d 416, 438 (W.D.N.Y. 2010) ("When a plaintiff's deposition testimony fails to support the allegations made in his complaint, those allegations will generally be deemed insufficient to create a genuine issue of material fact."); Perry v. Village of Arlington Heights, 186 F.3d 826, 828-829 (7th Cir. 1999); Colon–Fontanez v. Municipality of San Juan, 671 F.Supp.2d 300, 332 (D.P.R. 2009); Julceus v. City of North Miami, No. 08-23348, 2009 WL 3818430, *8 n. 4 (S.D.Fla. Nov. 13, 2009) .[11]

Webber also alleges that she engaged in protected activity when she complained to management that Williams' termination was unfair.  See Record Document 16-1 at 9-10. This allegation fails, as it is also negated by Webber's own deposition testimony:

> Q.    Did you make any comments to [White] during that meeting about the decision to terminate [Williams]?
>
> A.    No, I did not.  I didn't talk to her about it.  She pretty much clarified in our overall meeting, so there was nothing for me to discuss at that moment to [White].

---

[11]Webber states in her opposition that she "inquired as to whether race was a factor" when discussing a possible pay increase with Williams.  Record Document 16-1 at 4. However, while this statement is attributed to Webber in her opposition, a close review of the record reveals that the only evidence offered in support of this allegation is the deposition testimony of Williams, not Webber.  Williams' deposition testimony contradicts Webber's own deposition testimony and further appears to be inadmissible hearsay.  See Timberlake v. Teamsters Local Union No. 891, No. 10-60632, 2011 WL 2222189, *1 (5th Cir. June 8, 2011) ("This—the statement of another offered for the truth of the matter asserted—constitutes hearsay, and deposition hearsay is not competent summary judgment evidence.").

> Q.    Did you ever go to [White] and tell [her] that you disagreed with her decision to terminate [Williams]?
>
> A.    I did not.
>
> Q.    Okay.  Do you know if any of the individuals in the HR department that you discussed Nicole's termination with ever went to [White] and told her that you disagreed with the decision to terminate [Williams]?
>
> A.    No, I do not know.
>
> Q.    Okay.   All right.   Other than what we just talked about, you disagreeing with [Williams'] termination, is there any other race discrimination that you claim that you witnessed and opposed while you were at Schumpert?
>
> A.    No.

Record Document 12, Webber Deposition at 52-53.  Webber testified that she never spoke to White about Williams' termination and never informed White that she disagreed with the decision or believed that the decision was based on race.  Webber's retaliation claim is without merit because such a claim cannot be based on alleged protected activity that the employer knew nothing about.  See Walker v. Geithner, No. 10-10191, 2010 WL 4386747, *2 (5th Cir. Nov. 4, 2010) ("Walker cannot establish a *prima facie* case of retaliation, because there is no evidence that his employers were aware of his protected activity, so there is no causal link."); Manning v. Chevron Chemical Co., LLC, 332 F.3d 874, 883 (5th Cir. 2003) ("[I]n order to establish the causation prong of a retaliation claim, the employee should demonstrate that the employer knew about the employee's protected activity."); Medina v. Ramsey Steel Co., 238 F.3d 674, 684 (5th Cir.2001); Chaney v. New Orleans Pub. Facility Mgmt., Inc., 179 F.3d 164, 168 (5th Cir.1999).

Finally, Webber argues that even if she did not directly engage in protected activity, her reliance on others to make her complaints constituted protected conduct.  See Record

Document 16-1 at 10-12.  Webber contends that whether her claim based on Williams'
complaint to White is protected activity is dependent upon the inter-relatedness of the two
people.  See id. at 11.  Webber then points to the close relationship between herself and
Williams, as it is undisputed that the two of them were friends and even vacationed
together.

Webber's argument is grounded in Thompson v. North American Stainless, LP, —
U.S. —, 131 S.Ct. 863 (2011).  In Thompson, the Supreme Court discussed retaliation in
the context of third-party reprisals, specifically the firing of an employee to retaliate against
the employee's fiancee for filing a charge of discrimination with the EEOC:

> We think it obvious that a reasonable worker might be dissuaded from
> engaging in protected activity if she knew that her fiancee would be fired. .
> . .  Perhaps retaliating against an employee by firing his fiancee would
> dissuade the employee from engaging in protected activity, but what about
> firing an employee's girlfriend, close friend, or trusted co-worker? Applying
> the Burlington standard[12] to third-party reprisals, NAS argues, will place the
> employer at risk any time it fires any employee who happens to have a
> connection to a different employee who filed a charge with the EEOC.
>
> Although we acknowledge the force of this point, we do not think it
> justifies a categorical rule that third-party reprisals do not violate Title VII.  As
> explained above, we adopted a broad standard in Burlington because Title
> VII's antiretaliation provision is worded broadly. We think there is no textual
> basis for making an exception to it for third-party reprisals, and a preference
> for clear rules cannot justify departing from statutory text.
>
> We must also decline to identify a fixed class of relationships for which

_____

[12]In Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S.Ct. 2405
(2006), the Supreme Court redefined adverse employment action in the context of
retaliation, stating:

> In our view, a plaintiff must show that a reasonable employee would have
> found the challenged action materially adverse, which in this context means
> it well might have dissuaded a reasonable worker from making or supporting
> a charge of discrimination.

Id. at 68, 126 S.Ct. at 2415.

> third-party reprisals are unlawful. We expect that firing a close family member will almost always meet the <u>Burlington</u> standard, and inflicting a milder reprisal on a mere acquaintance will almost never do so, but beyond that we are reluctant to generalize.

<u>Id.</u> at 867.

<u>Thompson</u> is distinguishable from the instant matter, as Webber does not contend that Schumpert suspended her computer access or that she was constructively discharged to retaliate against Williams.  In fact, it would be impossible for her to maintain such a claim because Williams was terminated approximately one month before Webber's computer access was suspended and her alleged constructive discharge.  Webber's reliance on <u>Thompson</u> is simply misplaced.

Based on the foregoing analysis, the Court finds that Webber has failed to establish a *prima facie* case of retaliation because she has not met her burden of demonstrating that she participated in a Title VII protected activity.  Accordingly, summary judgment in favor of Schumpert is granted as to Webber's retaliation claim.[13]

## IV.    Intentional Infliction of Emotional Distress Claim.

Webber testified in her deposition that her intentional infliction of emotional distress was related to the suspension of her computer access.  <u>See</u> Record Document 12, Webber Deposition at 158.  She further stated that the alleged discrimination and retaliation caused her to feel "devastated."  Record Document 16-1 at 24-25.

In order to recover for intentional infliction of emotional distress, Webber "must

---

[13]Webber alleged that the suspension of her computer access and her constructive discharge were adverse employment actions.  Yet, because the Court has held that Webber did not engage in protected activity, it need not reach the issue of adverse employment action.

establish (1) that the conduct of [Schumpert] was extreme and outrageous; (2) that the emotional distress suffered by [her] was severe; and (3) that [Schumpert] desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from [its] conduct." White v. Monsanto Co., 585 So.2d 1205, 1209 (La. 1991). The Louisiana Supreme Court further explained:

> The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. Persons must necessarily be expected to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. Not every verbal encounter may be converted into a tort; on the contrary, "some safety valve must be left through which irascible tempers may blow off relatively harmless steam."

Id. Here, a review of the summary judgment record simply reveals no conduct on the part of Schumpert that would be regarded as atrocious and utterly intolerable in a civilized community. Summary judgment in favor of Schumpert is, therefore, granted as to Webber's intentional infliction of emotional distress claim.

## CONCLUSION

Based on the foregoing analysis, the Motion for Summary Judgment (Record Document 12) filed by Schumpert is **GRANTED**. The Court finds that Webber's racial discrimination claim relating to pay inequities fails because she did not suffer an adverse employment action and failed to establish that she was treated differently from others similarly situated. Webber's retaliation claim fails, as she failed to meet her burden of demonstrating that she participated in Title VII protected activity. The Court further finds that Webber's intentional infliction of emotional distress claim fails as it is wholly

unsupported by the summary judgment record.  Accordingly, all of Webber's claims against Schumpert are **DISMISSED**.

A judgment consistent with the terms of the instant Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED**, in Shreveport, Louisiana, this 2nd day of September, 2011.

S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE